Timothy HAMMER, Plaintiff-Appellee,

v.

Charles GROSS; Armando Zatarain; Newport Beach City, Defendants-Appellants,

Timothy HAMMER, Plaintiff-Appellant,

v.

Charles GROSS; Armando Zatarain, Newport Beach City; Linda Delapena, et al., Defendants-Appellees.

Nos. 87–6682, 88–5638.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1988.

Decided Sept. 6, 1989.

Thomas J. Feeley, Burke, Williams & Sorensen, Los Angeles, Cal., for defendants-appellants.

Stephen Yagman, Yagman & Yagman, P.C., Los Angeles, Cal., for plaintiff-appellee.

Jeffrey Wertheimer, Rutan & Tucker, Costa Mesa, Cal., for amicus curiae, City of Yorba Linda.

Frederick R. Millar, Jr., Supervising Deputy Atty. Gen., State of Cal., San Diego, Cal., for amicus curiae, State of Cal.

Before HALL, WIGGINS and THOMPSON, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appeal No. 87–6682 presents the difficult constitutional question of how much, if any, physical force police officers may use to compel a drunk driving suspect to submit to chemical testing in order to obtain evidence of intoxication for use in a criminal prosecution. Plaintiff-appellee Timothy Hammer brought this action under 42 U.S.C. § 1983 (1982), against defendants-appellants City of Newport Beach, California, former Newport Beach police chief Charles Gross, and Newport Beach police officer Armando Zatarain. Hammer claims that Officer Zatarain used excessive force to obtain a blood sample after lawfully arresting him for driving under the influence ("DUI") of alcohol, and that this use of excessive force was action under color of state law which deprived him of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

On timely appeal from a final judgment that was based on a jury verdict in favor of Hammer appellants contend, *inter alia,* that the district court erred in denying their motions for directed verdict and judgment notwithstanding the verdict ("JNOV"). They argue that neither the officer's actions nor the City policy regarding the use of force were unconstitutional and that, in any event, the individual officers were entitled to qualified immunity. We reverse.

I

Viewing the evidence in the light most favorable to Hammer, the relevant facts for purposes of this section 1983 action are as follows. At approximately 4:00 a.m. on June 23, 1985, Timothy Hammer was arrested upon probable cause for driving under the influence of alcohol, after failing a series of field sobriety tests administered by defendant-appellant Armando Zatarain, a police officer employed by the City of Newport Beach, California.

After applying handcuffs, Zatarain told Hammer that he would be required to take one of three chemical tests (blood, breath,

or urine) to determine his blood alcohol level. Hammer replied that he would refuse to take any of the tests because he thought "there was a good possibility" that a chemical test would indicate that he was intoxicated. Hammer later explained that he refused because he doesn't like needles. Hammer also testified that he believed his driver's license would be suspended for six months if he refused to submit to all three tests.[1]

Zatarain transported Hammer to the emergency room in a Newport Beach hospital, Hoag Memorial, to obtain a blood sample. Upon arrival, Zatarain handcuffed Hammer by his right wrist to a hard plastic chair. Approximately five minutes later, Zatarain again asked whether Hammer would submit to a blood test; Hammer again verbally refused. At that point, Zatarain told a Hoag Hospital laboratory technologist, Linda De La Pena, to withdraw the blood sample despite Hammer's objections. Although Zatarain denied ever having touched Hammer from the time appellee was first seated in the chair in the emergency room until De La Pena completed the blood withdrawal, Hammer testified that the officer grabbed his shoulders from behind and held him down in the chair while De La Pena began to swab his left forearm with iodine. Hammer "jumped" when De La Pena attempted to insert the needle into his arm, at which point he and Zatarain, who continued trying to restrain Hammer as Hammer tried to "wrestle away" from the needle, both went over sideways onto the floor along with the chair to which Hammer was still handcuffed.

After picking Hammer up off the floor, Zatarain told Hammer that he was going to take the blood sample "the easy way or the hard way." Zatarain then went into the

hallway, called in two other police officers to assist him and De La Pena in administering the blood test, and threatened that they would throw Hammer to the floor and pin him down to complete the test if necessary. Hammer testified that at that point he said he would consent to a breath test "if that's what it's going to come to," but that Zatarain insisted upon the blood test and once again held Hammer down in the chair while De La Pena took the blood sample as the other officers watched.[2]

On September 23, 1985, Hammer filed this section 1983 action seeking compensatory damages from all defendants, and punitive damages from the individual defendants. Defendants moved for summary judgment on November 10, 1986, asserting that the individual defendants were entitled to qualified immunity and that, because Zatarain contended that he was five feet away from Hammer during the blood withdrawal, there was no genuine issue of material fact as to a violation of the Fourth or Fourteenth Amendments. The district court denied defendants' motion on December 8, 1986. No appeal was taken from that decision, and the case proceeded to jury trial on October 6, 1987.

After a three-day trial and a denial of defendants' motion for a directed verdict, the jury of six men rendered a verdict on October 8, 1987, in favor of plaintiff-appellee Hammer, and assessed compensatory and punitive damages against Zatarain and Gross, and compensatory damages against the City of Newport Beach. The district court denied defendants-appellants' motions for judgment notwithstanding the verdict, and for a new trial, in a hearing held on November 16, 1987, and entered an order of final judgment the following day. Defendants timely appeal from that judgment.[3]

---

1. Hammer had previously been arrested on a DUI charge in 1980, and had passing familiarity with California drunk driving laws and penalties.

2. Hammer apparently entered a plea of no contest to the criminal DUI charge in this case; he was sentenced to attend three alcohol rehabilitation classes in the "3–D Program."

3. On December 7, 1987, the district court held a hearing on Hammer's application, filed pursuant to 42 U.S.C. § 1988, for an award of $51,125 in attorney's fees. In an order entered on January 20, 1988, Judge Hatter awarded fees in the amount of $23,000. Hammer timely appeals, in No. 88–5638, from this judgment. Because we are reversing the judgment that formed the basis for the district court's "prevailing party" determination, the attorney's fee award must be

## II

We consider first whether the district court erred in refusing to grant appellants' motions for directed verdict and for judgment notwithstanding the verdict ("JNOV"). This court applies the same test when reviewing a district court ruling on either of these motions, and our inquiry on appeal is identical to that of the district court. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir.1986), *cert. denied*, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987). That is, viewing the evidence as a whole in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, we must decide de novo whether there was substantial evidence to support the jury's verdict or, on the contrary, whether the only reasonable conclusion is that the moving party is entitled to judgment as a matter of law. *Id.; Peterson v. Kennedy*, 771 F.2d 1244, 1252, 1256 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). We also review de novo all questions of federal and state law. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *In re McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

■ It is well-settled that a plaintiff in a section 1983 action must show: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the claimant of a right secured by the Constitution or federal law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). Appellants do not challenge Hammer's showing of action under color of state law. They do, however, argue that Hammer has failed as a matter of law to prove any deprivation of a constitutional or federal right in this case.

## A

Until very recently, there were two arguably overlapping constitutional theories under which a plaintiff could proceed in a section 1983 action seeking damages against arresting officers who subjected him to physical force to obtain blood sample evidence for use in a DUI prosecution. The first was a theory that the particular search and seizure of blood alcohol evidence was "unreasonable" and, hence, a violation of the Fourth Amendment. A line of Supreme Court cases, beginning with *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and most recently including *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), would have controlled the Fourth Amendment issue in such an action.

The second theory was that the application of force by police in conducting the search and seizure was excessive in that it was "intentional, unjustified, brutal, and offensive to human dignity" in light of the need and purpose for which force was applied and, hence, a denial of substantive due process guaranteed by the Fourteenth Amendment. *See Rinker v. Napa County*, 831 F.2d 829, 831 (9th Cir.1987); *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1446 (9th Cir.1986); *Meredith v. Arizona*, 523 F.2d 481, 484 (9th Cir.1975) (adopting standard from *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).[4] The leading Supreme Court cases in this substantive due process area, in addition to *Schmerber*, were *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

In their briefs, the parties strongly disagree as to the applicability, meaning, and limits of these cases. Appellants argue that *Schmerber* authorized the use of force

---

vacated. We do not, therefore, reach the question raised by Hammer about the propriety of awarding less than half the amount of fees requested.

**4.** This standard remained as the applicable test for constitutional claims seeking damages for

police use of "excessive force" in the arrest/seizure context, *see* Devitt, Blackmar and Wolff, 3 *Federal Jury Practice and Instructions* § 103.08 (4th Ed.1987), until the Supreme Court decided *Graham v. Connor*, —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

to obtain a blood sample, so long as the force employed does not exceed the *Rochin* prohibition regarding force that "shocks the conscience." Hammer, on the other hand, argues that *Schmerber* prohibits both police initiation of violence in the taking of a blood sample and the use of "inappropriate force" in response to resistance by a DUI suspect. Hammer further contends that the "shocks the conscience" standard is no longer good law, and that Fourth Amendment "reasonableness" is the constitutional standard applicable to claims of excessive force in the arrest context.

■ While this appeal was pending, the Supreme Court announced its decision in *Graham v. Connor,* — U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), holding that *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* 109 S.Ct. at 1871 (emphasis original). Although the *Graham* Court specifically declined to decide whether the Fourth Amendment provides protection against the deliberate use of excessive force "beyond the point at which arrest ends and pretrial detention begins," 109 S.Ct. at 1871 n. 10, we think *Graham* controls this appeal. Because it involves the use of physical compulsion in connection with a search and seizure conducted as an incident of his arrest, *see Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836 (attempt to secure evidence of blood-alcohol content in that case was appropriate incident to petitioner's arrest), Hammer's "excessive force" claim is properly analyzed under Fourth Amendment principles.

**B**

In *Schmerber,* the Supreme Court decided that a warrantless search for and seizure of a blood sample,[5] obtained in a medically acceptable manner without the use of physical force but over the verbal objections of a misdemeanor DUI suspect who had been lawfully arrested upon probable cause after being hospitalized for injuries sustained in a drunk-driving accident, did not violate the Fourth Amendment prohibition against "unreasonable searches and seizures." 384 U.S. at 772, 86 S.Ct. at 1836. Accordingly, the Court held that the results of the chemical analysis[6] performed on the blood sample could be admitted into evidence in the subsequent criminal DUI prosecution. 384 U.S. at 772, 86 S.Ct. at 1836.[7]

The *Schmerber* Court's methodology, in deciding whether the particular bodily intrusion at issue in that case was "reasonable" within the meaning of the Fourth Amendment, is instructive. First, the Court recognized that the ordinary requirements of the Fourth Amendment—probable cause and a warrant or an exception,

---

**5.** Although it did not use the term in *Schmerber,* the Court has since declared that a compulsory blood extraction procedure, undertaken to obtain chemical evidence of intoxication, is a "search" for purposes of the Fourth Amendment. *Winston,* 470 U.S. at 759, 105 S.Ct. at 1616; *Skinner v. Ry. Labor Exec. Ass'n,* — U.S. ——, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989). The Court has also indicated that, to the extent it is viewed as a meaningful interference with a possessory interest in one's bodily fluids, the taking of a blood sample may also be a "seizure" within the meaning of the Fourth Amendment. *Skinner,* 109 S.Ct. at 1413 n. 4.

**6.** This court recently held that the chemical analysis of a blood sample obtained in conformity with *Schmerber* has no independent significance for Fourth Amendment purposes regardless of how promptly the test is conducted.

*United States v. Snyder,* 852 F.2d 471, 474 (9th Cir.1988). *But cf., Skinner,* 109 S.Ct. at 1412 (compelled physical intrusion penetrating beneath the skin infringes subject's reasonable expectations of privacy; chemical analysis of blood sample to obtain physiological data is further invasion of the tested person's privacy interests).

**7.** The *Schmerber* Court emphasized the fact-specificity of its holding, saying that "we reach this judgment only on the facts of the present record" involving "a minor intrusion" conducted under "stringently limited conditions." *Schmerber,* 384 U.S. at 772, 86 S.Ct. at 1836. The Court also cautioned against reading its opinion as indicating that the Constitution permits "more substantial intrusions, or intrusions under other conditions." *Id.*

such as exigent circumstances, justifying a warrantless intrusion—were to be threshold requirements for conducting a search and seizure entailing intrusion beneath the surface of the skin. *Schmerber,* 384 U.S. at 768–71, 86 S.Ct. at 1834–36; *see also Winston v. Lee,* 470 U.S. at 760–61, 105 S.Ct. at 1616–17.[8]

In the second part of its "reasonableness" analysis, the *Schmerber* Court analyzed separately the particular type of intrusive procedure and the manner in which the test was performed. *Schmerber,* 384 U.S. at 771–72, 86 S.Ct. at 1836. The Court held that the withdrawal of a minimal amount of blood, using a procedure that "involves virtually no risk, trauma, or pain," was a reasonable test for measuring blood alcohol. *Id.* at 771, 86 S.Ct. at 1836. The Court then decided that the simple blood test in that case, "taken by a physician in a hospital environment according to accepted medical practices," had been undertaken in a reasonable manner. *Id.*[9]

Recently, the Supreme Court further explicated the methodology for deciding whether a search involving a bodily intrusion is "reasonable" within the meaning of the Fourth Amendment. *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611.[10] In *Winston,* the Court invoked *Schmerber* to analyze a proposed surgical intrusion, under general anesthesia, into the chest muscle of an armed robbery suspect to search for evidence (a bullet allegedly fired by the shopkeeper victim of the attempted robbery) of the offense charged. The Court held that the Fourth Amendment would not permit such an "unreasonable" intrusion. *Winston,* 470 U.S. at 766, 105 S.Ct. at 1619–20. Although it was far from clear in the earlier opinion, the *Winston* Court described the *Schmerber* test of "reasonableness" as one in which the individual's interests in "personal privacy and bodily integrity" are balanced against the state's interest in "fairly and accurately determining guilt or innocence." *Winston* 470 U.S. at 762, 105 S.Ct. at 1617.

Even more recently, the Court announced a set of principles for testing the "reasonableness" of a particular use of force in the course of an arrest. *Graham,* 109 S.Ct. at 1871–72. The Court reiterated that

> "[d]etermining whether the use of force to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment inter-

**8.** The *Schmerber* Court held that the blood extraction in that case was supported by probable cause, and that it was constitutionally permissible to proceed without a warrant because of the exigent circumstances requiring prompt detection of evanescent blood alcohol levels. 384 U.S. at 770–71, 86 S.Ct. at 1835–36.

Hammer raises neither the probable cause nor the warrant requirement as an issue in this case.

**9.** In discussing the defendant's substantive due process claim, the *Schmerber* Court saw no reason to distinguish between the situation of *Schmerber* and that in *Breithaupt,* 352 U.S. 432, 77 S.Ct. 408, where the results of a blood alcohol test, taken in a hospital by a physician from an unconscious DUI suspect who had been seriously injured in a automobile accident in which three persons were killed, were admitted into evidence over a due process objection raised in the subsequent involuntary manslaughter prosecution. *Schmerber,* 384 U.S. at 760 n. 4, 86 S.Ct. at 1830 n. 4. The *Schmerber* Court declined to overrule the holding in *Breithaupt,* 352 U.S. at 435, 77 S.Ct. at 410, that it did not offend "that 'sense of justice' of which we spoke in *Rochin*

. . ." to admit into evidence the results of nonconsensual blood tests administered in the circumstances of the two cases. *Schmerber,* 384 U.S. at 760, 86 S.Ct. at 1830.

Although the Court found no substantive due process violation on the facts of *Schmerber* and *Breithaupt,* and seemed to say that there would be no due process violation if police used force to restrain a suspect who initiated physical violence to communicate a refusal to consent to a blood test, the Court said, "It would be a different case *if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force.*" *Schmerber,* 384 U.S. at 760 n. 4, 86 S.Ct. at 1830 n. 4. (emphasis added).

**10.** The Supreme Court has also invoked *Schmerber* in contexts other than searches entailing an invasion of the suspect's bodily privacy and integrity. *See, e.g., Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1984) (*Schmerber* balancing employed to hold that the use of deadly force against an unarmed and nondangerous fleeing felon is an unreasonable seizure in violation of the Fourth Amendment).

ests' against the countervailing governmental interests at stake."

*Id.* at 1871 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)) (internal quotation omitted). The *Graham* Court specifically mentioned "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," as factors to consider in assessing the reasonableness of the use of force to effect a particular seizure. 109 S.Ct. at 1871. On the other hand, the Court declared that the arresting officer's subjective intent "has no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *Id.* Finally, the Court emphasized that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 109 S.Ct. at 1872.

### C

With the foregoing principles in mind, we turn to the central issue in this appeal: whether Zatarain's use of physical force to compel Hammer to submit to a blood test in the circumstances of this case rendered the search for and seizure of blood alcohol evidence "unreasonable," within the meaning of the Fourth Amendment, under the balancing test prescribed by *Schmerber, Winston,* and *Graham.* It is the forcible manner in which Zatarain conducted the "search and seizure" of Hammer's blood sample with which we are primarily concerned.

It is important to note that the state interests in the instant case weigh into the balance almost exactly as they did in *Schmerber* itself. Hammer was arrested on a misdemeanor DUI charge and subjected to the "highly effective" blood alcohol test, *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836, the results of which are of "vital importance" to the fair and accurate enforcement of the state's drunk driving laws.[11] *Winston,* 470 U.S. at 763, 105 S.Ct. at 1618.

On the "individual interest" side of the scales, the actual blood test in this case—involving virtually no risk, trauma, or pain, and requiring the extraction of only a minimal amount of blood—was also substantially identical to the one administered in *Schmerber.* When the DUI suspects in both *Schmerber* and the instant case verbally refused to consent to the blood withdrawal, moreover, the procedure was carried out over their objections in a hospital setting by a qualified medical professional.

The key differences between *Schmerber* and the instant case are the use of force by Officer Zatarain, and the availability in California of certain types of legal coercion as alternatives to the use of force. We must consider how these two factors affect the Fourth Amendment balance that was struck in favor of the state in *Schmerber,* in order to determine whether a reasonable jury could find, on the basis of substantial evidence, that Zatarain subjected Hammer to an unreasonable search and seizure.

### 1

The availability of other forms of legal, as opposed to physical, coercion arguably cuts against a finding of reasonableness where police fail to utilize those alternatives. In particular, after *Schmerber* was handed down, the California legislature enacted an implied consent law, Cal.Veh.Code § 13353, as "an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit

---

**11.** If anything, the state interests in the circumstances of the *Schmerber* case were slightly stronger than those implicated here. *Schmerber* had apparently been driving drunk at about midnight when his car "skidded, crossed the road and struck a tree." *Schmerber,* 384 U.S. at 758 n. 2, 86 S.Ct. at 1829 n. 2. Both Schmerber and a passenger in his car were injured in the accident. *Id.*

In the instant case, Hammer was driving the only car on the road at 4:00 a.m., and was stopped only for exceeding the speed limit. The Supreme Court has noted that the "severity of the crime at issue" is a factor to which courts should give careful attention in determining the Fourth Amendment reasonableness of a search or seizure. *Graham,* 109 S.Ct. at 1872.

to a test for intoxication." *People v. Superior Court of Kern County (Hawkins),* 6 Cal.3d 757, 765, 100 Cal.Rptr. 281, 286, 493 P.2d 1145, 1150 (1972).[12] The effect of that legislation, according to the California Supreme Court, was "to equip peace officers with an instrument of enforcement not involving physical compulsion." *Id.* The constitutionality of section 13353 was sustained by the California Supreme Court in *Hernandez v. Dept. of Motor Vehicles,* 30 Cal.3d 70, 177 Cal.Rptr. 566, 634 P.2d 917 (1981).[13]

Another legal means for "compelling" DUI suspects to submit to blood (or breath or urine) testing was established in 1982. That year, the United States Supreme Court cleared away the constitutional obstacles that might otherwise have faced prosecutors who sought to introduce the refusal by a DUI suspect to submit to a blood-alcohol test as substantive evidence of guilt in a criminal DUI prosecution. *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (refusal to submit to blood alcohol test was not testimonial expression by which a DUI defendant was compelled to incriminate himself, and admitting evidence of refusal without prior warning that it would be used in prosecution did not render proceedings fundamentally unfair).[14]

With these alternative weapons for fighting the war against drunk drivers estab-lished, Hammer contends that the use of *any* amount of force by police officers to obtain blood alcohol evidence renders the "search" for it unreasonable within the meaning of the Fourth Amendment. For the following reasons, we decline to adopt the rule Hammer urges.

### 2

■ The use of force or physical restraint bears on the reasonableness of the *manner* in which the blood test was carried out, and weighs into the *Schmerber* balance as a factor in assessing the "nature and quality of the intrusion on the individual's Fourth Amendment interests," *Graham,* 109 S.Ct. at 1871. *See Skinner,* 109 S.Ct. at 1413 (any limitation on a person's freedom of movement necessary to obtain the blood, urine, or breath samples must be considered in assessing the intrusiveness of the search). The problem is to determine how much weight to give this factor.

In fact, the "force" used by Officer Zatarain in this case was nothing more than the application of physical restraint required to conduct the blood extraction in a safe and efficient manner. As the Supreme Court recently observed, "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the

---

12. Apparently, in many other states, statutes prohibit the use of force by police officers to obtain chemical evidence of intoxication without the consent of the DUI suspect. *See* Note, "'Shed Thou No Blood': The Forcible Removal of Blood Samples from Drunk Driving Suspects," 60 So.Cal.L.Rev. 1115, 1117 (1987), and accompanying notes. Even in states that do not prohibit the use of reasonable force, many law enforcement agencies have restricted their own discretion by developing policies or regulations that narrowly define the circumstances in which the use of force is permissible. *See id.* at 1118 n. 18, citing California Highway Patrol General Order 100.3, "Chemical Tests—Implied Consent Law," (rev. April 1986) (physical compulsion may be used, with supervisory approval, only if chemical test evidence is essential to felony DUI prosecution of driver involved in accident involving death or permanently disabling injury, and only if medically qualified person consents to do extraction notwithstanding the driver's resistance).

13. The California courts have held that "the desirability of obtaining blood samples in a noncoercive manner by one of the tests provided for in section 13353 may not be equated with constitutionality," and that the results of chemical analysis performed on a blood sample forcibly removed are admissible in a criminal DUI prosecution, "provided that (a) the removal is done in a reasonable, medically approved manner; (b) is incident to the defendant's arrest; and (c) is based upon the reasonable belief that the person is intoxicated." *People v. Ryan,* 116 Cal.App.3d 168, 182, 171 Cal.Rptr. 854, 861 (1981); *see also People v. Puccinelli,* 63 Cal. App.3d 742, 746, 135 Cal.Rptr. 534, 536 (1976).

14. The California courts have likewise held that admitting the unwarned refusal of a DUI suspect to submit to a blood alcohol test does not violate the privilege against self incrimination. *People v. Municipal Court for Visalia (Gonzales),* 137 Cal.App.3d 114, 117, 186 Cal.Rptr. 716, 718 (1982).

right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 109 S.Ct. at 1871. We think that jurisprudence also validates the particular application of force to effectuate the search and seizure which occurred in this case.

The *Graham* Court further noted that " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' *Johnson v. Glick*, 481 F.2d at 1033, violates the Fourth Amendment." 109 S.Ct. at 1872. Although we, like the California Supreme Court, recognize that the forcible removal of a blood sample from a DUI suspect will virtually always be "unpleasant, undignified and undesirable," *People v. Superior Court (Hawkins)*, 6 Cal.3d at 764, 100 Cal.Rptr. at 286, 493 P.2d at 1150, it will not always be—and was not in this case—unconstitutional.

Because the amount of force applied was minimal, and did not exceed the amount necessary to effect the otherwise lawful search for and seizure of blood alcohol evidence which occurred in the circumstances of this case, we hold as a matter of law that Officer Zatarain's conduct was not "unreasonable" within the meaning of the Fourth Amendment.[15] Having thus failed to establish that he was deprived of any right secured by the Fourth Amendment, Hammer's section 1983 claims against both the individual and municipal defendants must fall.[16]

The judgment of the district court is REVERSED.

**15.** We are well aware that the "reasonableness" test is a difficult one to apply consistently, *i.e.,* in a principled fashion, on a case-by-case basis. We note that the California courts have found it particularly difficult to analyze claims of excessive force brought by DUI suspects. *Compare People v. Kraft*, 3 Cal.App.3d 890, 84 Cal.Rptr. 280 (1970) (results of blood alcohol test suppressed because use of a scissors lock on the legs of a "defensive" DUI suspect was excessive under the circumstances and not "medically acceptable"), with *Carleton v. Superior Court*, 170 Cal.App.3d 1182, 216 Cal.Rptr. 890 (1985) (blood alcohol evidence was properly admitted because use of force by five police officers, one of whom used choke hold while other four pinned combative DUI suspect face-down on floor of isolation cell to facilitate extraction of blood sample, was reasonable and did not "shock the conscience" of the court).

**16.** Because we find no violation of a federal right in this case, we need not reach any of the other issues, including the question of the individual defendants' entitlement to qualified immunity, raised by the appellants.