## No. 27337

## The People of the State of Colorado v. Claudine Longet Williams

(557 P.2d 399)

Decided December 13, 1976.

250

Frank G. E. Tucker, District Attorney, Ashley Anderson, Deputy, for plaintiff-appellant.

Charles V. Weedman, Ronald D. Austin, for defendant-appellee.

*En Banc.*

MR. JUSTICE CARRIGAN delivered the opinion of the Court.

This is an interlocutory appeal seeking reversal of portions of a district court order suppressing evidence in a manslaughter case. After an extensive hearing on the defendant's motion, the trial court suppressed: (1) items of evidence (including the defendant's diary) found in a search of the defendant's residence, and (2) the results of laboratory tests performed on blood and urine samples obtained from the defendant despite her refusal to consent. We affirm.

A thorough review of the facts is essential to understanding the conclusions we have reached. Shortly before 5:50 p.m. on March 21, 1976, Lieutenant Baldridge of the Pitkin County Sheriff's office responded to a telephone report of a shooting at the Vladimir (Spider) Sabich residence in the Starwood subdivision near Aspen. The defendant and her three children had been living at the Sabich residence for some time. As Baldridge entered the subdivision's security gate, he picked up Roy Griffith, a private security officer who was on duty there. When the officers approached the Sabich residence, one of the defendant's children told them that Sabich had been shot.

Baldridge and Griffith arrived at the Sabich residence just ahead of an ambulance. Griffith immediately entered the house without knocking. Several emergency medical technicians entered close behind Griffith, and Baldridge followed them in. Glancing down a hallway, Griffith saw the defendant, who said, "in here, in here." As Griffith went down the hallway, he asked, "who shot who?" The defendant replied, "I shot Spider; help him." After Griffith observed Sabich lying wounded, and perhaps dead, on the bathroom floor, the defendant explained that a handgun had accidently discharged while Sabich was showing her how to use it. She indicated that the gun was around somewhere.

Griffith went down the hall looking for the gun, and through an open bedroom door, he spotted a .22 caliber pistol lying on a bed and two long-barrelled guns standing in the corner. Griffith delivered the pistol to Baldridge and informed him of the long guns. Baldridge immediately checked the latter, a rifle and a shotgun, and found they were not loaded.

The defendant was not arrested at the residence. Rather she was allowed to accompany Sabich in the ambulance to the hospital.

The house was then secured by the police. Griffith guarded the front door while Baldridge took photographs inside. Baldridge testified that while photographing, he noticed a ledger-type book (the diary here involved) on top of the dresser in the bedroom where the pistol had been found. However, Baldridge's testimony was contradicted by his own photographs, apparently made before this dresser was searched. These photographs clearly depict this dresser with all drawers neatly closed and no diary in sight. Other testimony revealed that this diary was normally kept inside the top dresser drawer, and, in fact, was there when found. Photographs taken later that night showed the diary on top of the dresser but also revealed that the drawers obviously had been opened and re-closed, after Baldridge's photographs, leaving some drawers ajar with clothing protruding. Baldridge testified that he did open the top three dresser drawers, but that he had found the diary on top of the dresser before opening them.

On the basis of the conflicting testimony and the photographic evidence, the trial court found that Baldridge was mistaken in his testimony that he found the diary lying on top of the dresser. Rather the trial court, which heard the witnesses, found that the diary had been inside the closed dresser drawer and was found there in Baldrige's search without a warrant. Since competent evidence supports this finding, we accept it.

Baldridge opened the ledger after completing his photography and read enough to determine that it was somebody's diary. The diary was not removed from the residence until it was taken the next day pursuant to a search warrant.

While Griffith stood guard at the front door, Baldridge, without a warrant, searched the house for nearly two hours for other evidence connected with the shooting. During this time, Baldridge called a fellow officer and directed that the defendant be arrested. She was arrested at the hospital, given her *Miranda*[1] warnings, and taken to the sheriff's office.

A deputy district attorney told Baldridge that he had seen the defendant at a bar earlier on the day of the shooting. Baldridge had not noticed any odor of liquor in his contacts with the defendant at the Sabich house but did note a faint smell of liquor about her later. He ordered her returned to the hospital for blood and urine tests. These were performed over her objection. Officers and a hospital technician testified, without contradiction, that she did not appear at any time to be under the influence of alcohol or drugs.

At about 9:30 or 10:00 on the evening of the shooting, Baldridge, Griffith, the District Attorney, and members of the latter's staff returned to the Sabich house. Without any warrant, they conducted a second search

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

throughout the house for evidence related to the shooting.

About mid-afternoon the next day, Lieutenant Baldridge and a deputy district attorney presented an affidavit to the Pitkin County Judge, and obtained a search warrant listing the diary as one of the items to be seized. Pursuant to this warrant, the diary which Baldridge had discovered and partially read the previous day was seized.

In seeking reversal of the trial court's suppression order, the People have raised two points of alleged error. First, it is claimed that the defendant's diary was properly seized pursuant to the search warrant and that Baldridge's first search, which provided the information for specifying the diary in the warrant, did not violate the defendant's Fourth Amendment rights. Second, it is claimed that the non-consensual taking of the blood and urine samples constituted a proper, limited search incident to arrest based on a clear idication that probative and highly evanescent evidence would be obtained. The People argue that it was error to suppress the diary and the results of these tests, thus rendering this evidence inadmissible at the forthcoming manslaughter trial. We consider these two categories of evidence separately.

## I.
### ADMISSIBILITY OF THE DEFENDANT'S DIARY

The People assert that the seizure of the diary was accomplished pursuant to a properly issued and executed search warrant. However, the search which ultimately resulted in seizing the diary was completed the day before the search warrant was sought. Since the warrant issued the following day cannot relate back to legitimize Lieutenant Baldridge's search immediately after the shooting,[2] the critical inquiry is whether his initial search was unlawful when conducted.

The Fourth Amendment to the United States Constitution provides protection against unreasonable searches and seizures in the following unequivocal language:

"The right of the people to be secure in their persons, *houses, papers* and *effects* against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Empahsis added.)[3]

Clearly, a personal diary secreted under clothing in one's bedroom dresser drawer is an item of the kind intended to be protected by the

---

[2] See, *e.g., People v. Hannah*, 183 Colo. 9, 12, 514 P.2d 320, 322 (1973); *Condon v. People*, 176 Colo..212, 219, 220, 489 P.2d 1297, 1301 (1971) (where odor thought to be decomposing human body did not justify warrantless search, obtaining warrant later did not validate prior search); *Wilson v. People*, 156 Colo. 243, 248, 249, 398 P.2d 35, 38 (1965) (arrest made after illegal search cannot relate back to validate search as incident to that arrest).

[3] A comparable protection is found in Colorado Constitution Article II, Section 7.

Fourth Amendment's warrant requirement. Indeed, it would be difficult to imagine what "papers and effects" should be more entitled to privacy than one's personal diary.[4]

■ Exceptions to the warrant requirement have been recognized in certain well-defined instances.[5] The People contend that one such exception, that for "exigent circumstances," justified the search which resulted in finding the diary. They also seem to contend that a new exception to the Fourth Amendment warrant requirement should be recognized for a reasonable investigation at the scene of a recent homicide. Exceptions to the warrant requirement, however, must be carefully limited lest the Fourth Amendment's protections be eaten away by exceptions.[6]

We turn now to an application of these principles to the original search which uncovered the diary. The diary was found in a search of the defendant's dresser conducted after she had already left and the house had been secured, but before she was arrested. The pistol involved in the shooting had already been discovered in plain sight, and the two long guns had been found to be unloaded. A guard had been posted at the front door, and the condition of the premises shortly after the incident had been recorded on film.

Under the circumstances, with the defendant gone and the house secured, there was no justification for not seeking a warrant from one of the locally available judges before proceeding with the search. There was no indication of any risk that the evidence at the house might have been lost or destroyed while a warrant was being obtained.

The People, claiming that "exigent circumstances" justified dispensing with the warrant requirement, have cited cases from other jurisdictions which have condoned searches at homicide scenes. Most of these cases involved limited searches for guns, knives, or other instrumentalities of

---

[4] In *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967), the Court declared; ". . . the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."

[5] *See, e.g., United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (incident to arrest); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop and frisk); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (exigent circumstances). For an extensive discussion of the "plain view" exception, *see Coolidge v. New Hampshire*, 403 U.S. 443, 464-72, 91 S.Ct. 2022, 2037-42, 29 L.Ed.2d 564, 581-87 (1971).

[6] In *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Court said: ". . . the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' 'The burden is on those seeking the exemption to show the need for it.'" (Citations omitted.) 403 U.S. at 454-55, 91 S.Ct. at 2032, 29 L.Ed.2d at 576.

crime.[7] One involved a limited investigation to learn the cause of death.[8] Others involved seizure of items in plain view.[9] These authorities do not support the contention that, in situations comparable to this case, exigent circumstances justify a warrantless general search.

Further, the evidence here would not support a finding of exigent circumstances based on a reasonable belief that, without an immediate search, other persons might be harmed, a dangerous criminal might escape, or evidence might be lost or destroyed.[10] We conclude that no exigent circumstances existed to justify the police failure to obtain a warrant before conducting the general search.

Since no other previously recognized exception to the warrant requirement has been asserted, we consider the contention, implicit in the People's argument, that a new exception should be adopted judicially for on-scene searches following recent homicides. The People rely primarily on *People v. Superior Court*, 41 Cal. App. 3d 636, 116 Cal. Rptr. 24 (1974), for support for this proposed new exception. That case, however, does not support the contention that searches at homicide scenes should be specially excepted from the warrant requirement. On the contrary, the court there expressly held that the defendant unconditionally consented to the search and stated, *obiter dictum*, that exigent circumstances justified the search. Moreover, the search was conducted at the time and place of a custodial arrest. The case is inapplicable here where the defendant did not consent to the search, it was not incident to an arrest, and there were no exigent circumstances.[11]

■ We recognized the valid governmental interest in speedy investigation at the scene of a recent homicide. In our opinion, however, the already recognized "exigent circumstances" exception is sufficient to allow searches where police necessity to search without waiting for a warrant outweighs the interest in protecting privacy. The exception for exigent circumstances applies in homicide cases as in other crimes. We decline to further undermine fundamental Fourth Amendment protections by creating a new exception to the normal warrant requirements.

---

[7] *People v. Wallace*, 31 Cal.App. 3d 865, 107 Cal. Rptr. 659 (1973); *State v. Oakes*, 276 A.2d 18 (Vt. 1971); *cert. denied*, 404 U.S. 965, 92 S.Ct. 340, 30 L.Ed.2d 285 (1971); *Longquest v. State*, 495 P.2d 575 (Wyo. 1972), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972).

[8] *State v. Chapman*, 250 A.2d 203 (Me. 1969).

[9] *Stevens v. State*, 443 P.2d 600 (Alaska 1968); *Patrick v. State*, 227 A.2d 486 (Del. 1967).

[10] But *cf. People v. Sirhan*, 7 Cal. 3d 710, 497 P.2d 1121 (1972), *cert. denied*, 410 U.S. 947, 93 S.Ct. 1382, 35 L.Ed.2d 613 (1973) (probable cause existed to believe the defendant might assassinate other political leaders).

[11] Stronger support for the People's position is found in *State v. Sample*, 107 Ariz. 407, 489 P.2d 44 (1971). However, since *Sample* upheld a general, warrantless post-homicide search without establishing any guidelines for such searches, we decline to further erode the Fourth Amendment by following it.

We hold that the search of the defendant's bedroom dresser drawer, which first revealed the diary, violated her Fourth Amendment rights. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Information gained in that unlawful search may not be used to support the search warrant obtained later. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Thompson*, 185 Colo. 208, 523 P.2d 128 (1974). Therefore, the ultimate seizure of the diary under the warrant cannot legitimize the initial, unlawful seizure. Accordingly, the diary was properly suppressed.

## II.
### ADMISSIBILITY OF THE BLOOD AND URINE TEST RESULTS

The People also claim that the trial court erred in suppressing the blood and urine test results. Since the blood and urine samples were obtained under the same circumstances, admissibility of the test results from both is governed by the same rationale.

When Lieutenant Baldridge ordered these tests, he had received information that a deputy district attorney had seen the defendant drinking at a local bar earlier during the day of the shooting. There was no evidence to indicate what beverage or how much she drank, or at what time the drinking occurred. Baldridge did not infer from his contacts with the defendant at the homicide scene that she was under the influence of alcohol or drugs. Police officers and a hospital technician testified that they had been close to her at the hospital and that they had no reason to believe that she was under the influence of any such substance. Baldridge reported smelling "alcohol" on her breath at the hospital, but not earlier at the Sabich house. There was never any thought of charging her with any crime directly related to alcohol or drug abuse.

The defendant initially refused to consent to the blood and urine tests but submitted after the police told her that she had no choice. The samples were taken at a hospital in accordance with accepted medical pratices.

It is well established that, incident to a custodial arrest, a defendant is subject to a full body search. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Allarid v. People*, 162 Colo. 537, 427 P.2d 696 (1967). If probable cause supports the arrest, no additional justification is required to search the defendant's person. *United States v. Robinson, supra*, 414 U.S. at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 441.

Obviously, this rule would have jusified a search of the defendant and her clothing as incident to her arrest. The problem, however, is whether there must be an additional showing, beyond the probable cause needed to

arrest, to justify the more serious intrusions of injecting a needle to draw blood and requiring production of a urine specimen.

█ It is settled that extraction or compelled production of bodily fluids is a "search" within the meaning of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Here the existence of probable cause for the defendant's custodial arrest has not been questioned.

█ However, because of the special insult to human dignity involved when police seek evidence in body apertures or bodily fluids, special rules restrict internal body searches. If, as in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the bodily intrusion is conducted by means so patently abusive as to "shock the conscience," the search may violate due process. Mere withdrawal of blood under medically acceptable conditions, however, does not, per se, shock the conscience nor deny due process. *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

█ In *Schmerber v. California, supra*, the United States Supreme Court squarely faced the issue of whether withdrawing a defendant's blood for a blood alcohol test incident to an arrest violated his Fourth Amendment rights. There the Court distinguished the usual searches of the person and clothing from those involving intrusions inside the body. With respect to these *internal* searches, *Schmerber* held that the inquiry regarding justification to proceed with an internal body search without a warrant is not obviated by the fact that the search is conducted incident to a lawful arrest based on probable cause.

Rather *Schmerber* established a higher, more protective standard for these attempts to find evidence within the body. To protect human dignity, such internal body searches may be made only where, in addition to the probable cause supporting the arrest, there exists a "clear indication" to believe that relevant evidence will be obtained. In the Court's words:

"The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beneath the body's surface] on the mere chance that desired evidence might be obtained. In the absence of a *clear indication* that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." (Emphasis added.) 384 U.S. at 769, 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919.[12]

---

[12] This court frequently has followed *Schmerber* in cases involving drunk driving. However, because of the obvious evidence of intoxication present in those cases, the court has not had occasion to analyze the "clear indication" standard. *See, e.g., People v. Smith*, 175 Colo. 212, 486 P.2d 8 (1971) (following serious auto accident, driver found unconscious with partially empty wine jug in car); *People v. Kokesh*, 175 Colo. 206, 486 P.2d 429 (1971) (in drunk driving death case defendant appeared groggy, glazed-eyed and smelled of alcohol).

Applying this rationale to the instant case, we conclude that probable cause to suspect guilt of a crime was the proper standard to justify arresting the defendant, and any external body search incident to that arrest. However, in the interest of protecting human dignity, an additional standard had to be met to justify extracting her blood and urine for testing. In determining whether forced production of bodily fluids is permissible, the appropriate standard is *clear indication* that evidence of intoxication or drug abuse will be found. Moreover, there must be some indication that evidence of drugs or alcohol, if found, will be relevant to a crime for which the defendant may be charged.

We turn next to the question whether Lieutenant Baldridge, when he ordered the blood and urine tests, had a "clear indication" that relevant evidence of intoxication would be found. This requires consideration of what the term "clear indication" means.

Because narcotics are sometimes smuggled into this country in body orifices, the Ninth Circuit, in border search cases has had occasion to interpret the "clear indication" standard. To justify a warrantless intrusion into the body incident to a border search, there must be a clear indication that the intrusion will produce evidence. In *Rivas v. United States*, 368 F.2d 703 (9th Cir. 1966), the court, citing *Schmerber*, said:

"An honest 'plain indication' that a search involving an intrusion beyond the body's surface is justified cannot rest on the *mere chance* that desired evidence may be obtained. Thus we need not hold the search of any body cavity is justified merely because it is a border search, and nothing more. There must exist facts creating a clear indication, or plain suggestion, of the smuggling. Nor need those facts reach the dignity of nor be the equivalent of 'probable cause' necessary for an arrest and search at a place other than a border.

". . . The uncertainty of what constitutes a 'clear indication' over and beyond a 'mere suspicion' is difficult, but not impossible to resolve." 368 F.2d at 710.

In *Rivas*, a previously convicted, registered user of narcotics, with "glary" eyes indicating the influence of narcotics, crossed the border. He was extremely nervous and had numerous recent needle marks on his arms. This evidence, in light of the well known practice of smuggling narcotics in the rectum, was held sufficient to constitute a "clear indication" that narcotics would be found in a physician's search of his rectum.

█ In the present case, the evidence of the defendant's drinking on the day of the shooting could support no more than a mere suspicion that she might have been intoxicated several hours later when the blood and urine tests were ordered. There was no proof that her beverage was alcoholic, how much she drank, or how long before the shooting she drank. The slight liquor smell on her breath may have indicated that alcohol had been consumed, but, by itself, did not clearly indicate intoxication. To

justify an internal search without consent or a warrant, there must be a "clear indication" that the defendant was intoxicated.[13] But here there was mere suspicion uncorroborated by any of the familiar signs of intoxication.

In *Schmerber, supra*, the court described the evidence which gave rise to the "clear indication" of intoxication there:

"The police officer who arrived at the scene shortly after the accident smelled liquor on petitioner's breath, and testified that petitioner's eyes were 'bloodshot, watery, sort of a glassy appearance.' The officer saw petitioner again at the hospital, within two hours of the accident. There he noticed similar symptoms of drunkenness." 384 U.S. at 768, 769, 86 S.Ct. at 1834, 1835, 16 L.Ed.2d at 918, 919.

No such signs of this defendant's being drunk were observed either in her home or, later, at the hospital. Therefore, we hold that the searches which obtained blood and urine samples against her will were conducted without any clear indication that these fluids would produce evidence of intoxication or drug use, thus violating her rights under the Fourth Amendment and Article II, § 7 of the Colorado Constitution. The blood and urine test evidence was properly suppressed.

We affirm the trial court's rulings on the Motion to Suppress Evidence and remand the case to the trial court for further proceedings not inconsistent with this opinion.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE KELLEY concur in the result.

---

[13] In the typical alcohol or drug case, this clear indication requirement is easily satisfied by observations of the defendant's speech, gait, breath, appearance, and conduct. Obviously, the "clear indication" test is not involved where the defendant expressly consents or consent is implied under section 42-4-1202(3), C.R.S. 1973.