STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Michael L. SEIBEL, Defendant-Appellant.

Supreme Court

*No. 90–0895–CR. Argued May 30, 1991.—Decided June 27, 1991.*

(Also reported in 471 N.W.2d 226.)

For the plaintiff-respondent-petitioner the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Michael Yovovich,* assistant state public defender.

LOUIS J. CECI, J. This case is before the court on petition for review of a decision of the court of appeals, *State v. Seibel,* 159 Wis. 2d 313, 464 N.W.2d 86 (Ct. App. 1990). The court of appeals reversed a nonfinal order of the circuit court for Trempealeau County, Robert W. Radcliffe, Circuit Judge, presiding, which denied Michael L. Seibel's (the defendant) motion to suppress evidence of intoxication obtained by a blood test.

Two issues are presented by this review. The first issue is whether the standard for drawing a blood sample in a search incident to an arrest is "reasonable suspicion" or "probable cause" that the defendant's blood contains evidence of a crime. We hold that blood may be drawn in a search incident to an arrest if the police reasonably suspect that the defendant's blood contains evidence of a crime.

The second issue presented by this review is whether the police reasonably suspected that the defendant's blood contained evidence of the crime. We hold that under the facts of the case at bar the police reasona-

bly suspected that the defendant's blood contained evidence of a crime. Therefore, we conclude that the circuit court properly denied the defendant's motion to suppress the results of the blood test.

The facts relevant to this review are not in dispute. On October 14, 1989, the defendant was involved in a multi-vehicle accident on Highway 53 just south of Osseo at approximately 6:00 p.m. The defendant and several friends were driving their motorcycles north in a no-passing zone when the defendant crossed over the center line by approximately one foot as a Ford Taurus (the Taurus) came around a curve in the southbound lane. The defendant sideswiped the Taurus, causing it to go out of control and cross into the northbound lane at an angle. The Taurus was then struck broadside by a northbound car.

Both occupants of the Taurus were killed. All four occupants of the northbound car were injured, two seriously. The defendant suffered a minor injury to his left ankle.

Several officers responded to the accident scene. The officers spoke with the driver of the vehicle which was traveling immediately behind the group of motorcycles driven by the defendant and his friends (the witness). The witness stated that the accident occurred after the defendant had drifted approximately one foot over the center line for no apparent reason.[1] The officers determined that the positions of the vehicles, as well as the location of the skid marks, oil streaks, and debris,

---

[1]While the witness stated that the defendant was not driving erratically prior to the accident, it is undisputed that the defendant crossed the center line by approximately one foot immediately before the collision between the defendant and the Taurus and that when said collision occurred, the defendant was on the wrong side of the road.

corroborated the witness's statement. After the defendant had been transported to the hospital and as the officers were conducting their investigation of the accident, they detected a very strong odor of intoxicants emanating from the group of cyclists with whom the defendant had been traveling.[2]

The officer in charge of investigating the accident determined that the defendant should be arrested for homicide by negligent use of a motor vehicle and that a sample of his blood should be taken incident to his arrest. The officer in charge then ordered, through a dispatcher, an officer who was not present at the scene (the arresting officer) to proceed to the hospital where the defendant had been transported for treatment of his injury, arrest the defendant, and obtain a blood sample.

Upon arriving at the hospital, the arresting officer asked the Osseo Chief of Police (the police chief) where she could find the defendant. The police chief knew where the arresting officer could find the defendant because, in his capacity as an emergency medical technician, he had been assisting in the x-raying of the defendant. During said x-raying, the police chief thought he smelled an intoxicant on the defendant, but when he repositioned himself in an attempt to smell it again, he could not redetect the odor. However, it is undisputed that the defendant reeked of an antiseptic which had recently been applied to his injury. After assisting in x-ray, the police chief proceeded to the waiting area, where he met the arresting officer and led her to the defendant in the x-ray department.

---

[2]While the officers did not observe anything to suggest that the defendant's fellow travelers were intoxicated to the point of being impaired, it is undisputed that they detected a strong odor of intoxicants emanating from them.

Once the police chief returned to the x-ray department with the arresting officer, the police chief asked to see the defendant's driver's license. The defendant responded with something to the effect of "what for, they hit [or struck] me."[3] The police chief then stepped aside and let the arresting officer take over. The arresting officer repeated the police chief's request, and the defendant provided the arresting officer with his driver's license.

Subsequently, the arresting officer mistakenly informed the defendant that he was under arrest for operating a motor vehicle while under the influence of intoxicants. In response, the defendant said, "I'm under arrest, what are you doing about the car that hit me?" The arresting officer then stated that she was acting under instructions from the officers at the accident scene, read the defendant his rights, and informed him of the provisions of the implied consent law. The defendant agreed to give a blood sample under the implied consent law.[4] The blood sample was drawn by a lab technician. A test performed on the blood sample

---

[3]While it is true that the police chief was dressed in civilian clothes because he had come to the hospital to act as an emergency medical technician, it is undisputed that the defendant refused to show the police chief his license because he believed, contrary to the undisputed facts in the record, that the Taurus was responsible for causing the accident. Defense counsel suggests that the defendant did not produce his driver's license because he did not know the defendant was a law enforcement officer. However, defense counsel's suggestion is mere speculation. Nothing in the record supports such a conclusion. In fact, as will be discussed below, the defendant was uncooperative when he spoke with the uniformed arresting officer.

[4]Because the defendant agreed to give a blood sample under the provisions of the implied consent law, the state does not argue that the defendant consented to the search of his blood.

showed that the defendant had a blood alcohol level of .266 percent. Under sec. 885.235(1)(c), Stats., a blood alcohol level of .10 percent is prima facie evidence of intoxication.

On December 11, 1989, the defendant was charged with two counts of homicide by intoxicated use of a vehicle, two counts of homicide while operating a vehicle with an excessive blood alcohol concentration, four counts of injury by intoxicated use of a vehicle, and four counts of injury while operating a vehicle with an excessive blood alcohol concentration. On March 8, 1990, the defendant moved the circuit court to suppress the blood alcohol test on the grounds that the blood sample on which the test was performed was collected in violation of the defendant's fourth amendment right to be free of unreasonable searches and seizures.

The court conducted an evidentiary hearing on the defendant's motion to suppress on March 9, 1990. The defendant argued that since probable cause did not exist to arrest the defendant for operating while intoxicated, the blood test was performed in violation of the fourth amendment. The State of Wisconsin (the state) argued that the blood test did not violate the fourth amendment because there was probable cause to arrest the defendant for homicide by negligent operation of a motor vehicle and reason to suspect that the defendant had consumed alcoholic beverages. The state further argued that exigent circumstances, to wit, the fact that alcohol dissipates as a result of natural bodily functions, justified drawing the blood sample without a search warrant.

The circuit court agreed with the state's reasoning and denied the defendant's motion to suppress by order entered April 23, 1990. The defendant sought leave to appeal the circuit court's order on April 25, 1990. By order dated May 14, 1990, the court of appeals granted

leave to appeal and stayed all further proceedings in the circuit court.

The parties took the same positions in the court of appeals that they took in the circuit court. The court of appeals concluded that the drawing of the blood sample constituted an illegal search under *Schmerber v. California,* 384 U.S. 757 (1966), and *Winston v. Lee,* 470 U.S. 753 (1985). The court of appeals reasoned that under *Schmerber* and *Winston,* blood may not be drawn incident to an arrest unless the police have probable cause to believe that the defendant's blood contains evidence of a crime and the police possess a warrant or an exception to the warrant requirement. *Seibel,* 159 Wis. 2d at 318.

Since the state conceded that probable cause did not exist to draw the defendant's blood, the court of appeals concluded that the drawing of the blood sample constituted an illegal search whose fruits, the results of the blood alcohol test, must be suppressed. *Id.* at 318–19. Accordingly, the court of appeals reversed the circuit court's order. *Id.* at 322.

In so ruling, the court of appeals rejected the state's contention that the United States Supreme Court in *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985), interpreted *Schmerber* as requiring only a reasonable suspicion that a defendant's blood contain evidence of a crime before a blood sample may be drawn from the defendant incident to a lawful arrest. The court of appeals reasoned that *Montoya* did not apply to the case at bar because it was not a search case. *Seibel,* 159 Wis. 2d at 320.

The state petitioned this court for review of the decision of the court of appeals, which we granted.

■

Whether a search violated the fourth amendment is a question of law when the material facts regarding the

search are undisputed. *State v. Tompkins,* 144 Wis. 2d 116, 121, 423 N.W.2d 823 (1988). Accordingly, we review the issues presented in this case independently and without deference to the circuit court or the court of appeals. *Id.*

## I. WHETHER "A REASONABLE SUSPICION" IS THE STANDARD FOR DRAWING BLOOD INCIDENT TO AN ARREST

The gravamen of the court of appeals decision is that *Montoya* did not interpret *Schmerber* as requiring only a reasonable suspicion before a blood sample may be drawn incident to an arrest. We disagree.

In *Schmerber,* the defendant, while being treated at a hospital for injuries suffered in an accident involving the vehicle the defendant had been driving, was arrested for the criminal offense of driving under the influence of an intoxicating liquor. A physician at the hospital drew a blood sample at the direction of a police officer. A blood test indicated that the defendant was intoxicated at the time of the accident. The defendant objected to the admission of the results of the blood test on the grounds that the drawing of the blood sample constituted a search which violated the fourth amendment. *Schmerber,* 384 U.S. at 758–59.

The Court rejected the defendant's claim that the drawing of the blood sample violated the fourth amendment. However, the Court did not justify the search merely on the grounds that the search was conducted incident to an arrest. Rather, the Court held that when searches involve intrusions beyond the body's surface:

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such

172

intrusions on the mere chance that desired evidence might be obtained. In the absence of *a clear indication that in fact such evidence will be found,* these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Id.* at 769–70 (emphasis added).[5] Therefore, under *Schmerber,* a blood sample may not be drawn incident to an arrest unless there is "a clear indication" that evidence will be found in the blood sample.

The *Schmerber* Court did not define what constitutes "a clear indication." However, in *Montoya,* the Court stated that:

the words ['a clear indication'] in *Schmerber* were used to indicate the necessity for particularized suspicion that the evidence sought might be found within the body of the individual, rather than as enunciating still a third Fourth Amendment threshold between 'reasonable suspicion' and 'probable cause.'

*Montoya,* 473 U.S. at 540. The Court further stated that under the reasonable suspicion standard, law enforcement officials must have a " 'particularized and objective basis for suspecting the particular person . . ..' " *Id.* at 541 (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)). Therefore, the above-quoted language from *Montoya* equates the phrase "a clear indication" with "reasonable suspicion."

---

[5]The Court also indicated that any search which intruded beyond the body's surface must be conducted via a reasonable procedure and must be performed in a reasonable manner. *Id.* at 771.

173

The court of appeals incorrectly concluded that *Montoya* does not apply to the case at bar because it was not a search case. While it is true that *Montoya* involved a seizure at the border, rather than a search, *Montoya's* definition of "a clear indication" applies to searches for four reasons. First, the *Montoya* Court defined "a clear indication" in terms of searches. For example, the Court stated that:

> the words in *Schmerber* ['a clear indication'] were used to indicate the necessity for particularized suspicion that the evidence sought might be found *within the body* of the individual . . ..

*Montoya,* 473 U.S. at 540 (emphasis added). The *Montoya* Court's reference to finding evidence within the body clearly refers to a search beyond the body's surface.

Second, the *Montoya* Court did not suggest that *Schmerber's* "clear indication" standard meant one thing in border seizure cases and another thing in searches incident to an arrest. To the contrary, the Court explained what the phrase "a clear indication" meant in terms of search cases and then applied its explanation to the case at bar, which was a seizure case. Moreover, at least two courts have applied the "clear indication" standard in search cases. *See, e.g., Rivas v. United States,* 368 F.2d 703 (9th Cir. 1966), *cert. denied* 386 U.S. 945 (1967) (holding before *Montoya* that "a clear indication" is between a mere chance and probable cause); *People v. Williams,* 192 Colo. 249, 557 P.2d 399 (1976) (following *Rivas).*

Third, contrary to the defendant's contention, *Montoya* is not distinguishable because the defendant in *Montoya* was a traveler who had a diminished expectation of privacy when crossing the border. *Montoya's* explanation of *Schmerber* was completely independent

174

of the facts of *Montoya.* Furthermore, no one has a lesser expectation of privacy than a person who has just been arrested. *See, e.g., United States v. Robinson,* 414 U.S. 218, 235 (1973); *State v. Fry,* 131 Wis. 2d 153, 169, 388 N.W.2d 565, *cert. denied* 479 U.S. 989 (1986).

Fourth, contrary to the assertion in Justice Abrahamson's dissent, at 186, 187, the *Montoya* Court did not limit its holding to exclude cases such as the one at bar. Rather, the *Montoya* Court expressly stated that it was not addressing what level of suspicion is required for nonroutine border searches. *Montoya,* 473 U.S. at 541 n.4. The *Montoya* Court did not limit its express and unambiguous interpretation of *Schmerber*'s clear-indication test. The mere fact that the *Montoya* Court stated that its holding does not apply to nonroutine border searches does not undermine its express interpretation of *Schmerber* which involved a search incident to an arrest, not a nonroutine border search.[6] Moreover, the *Montoya* Court clearly rejected the dissent's conclusion that *Schmerber* requires probable cause when it stated that:

[6]The other authorities cited by Justice Abrahamson are equally unpersuasive. *State v. Zielke,* 137 Wis. 2d 39, 403 N.W.2d 427 (1987), and *State v. Bentley,* 92 Wis. 2d 860, 286 N.W.2d 153 (Ct. App. 1979), did not discuss *Montoya*'s interpretation of *Schmerber,* and *Bentley* was decided before *Montoya.* Accordingly, they do not support the dissent's conclusion that *Schmerber* requires probable cause to draw blood incident to an arrest.

Justice Abrahamson also relies on *Hammer v. Gross,* 884 F.2d 1200 (9th Cir. 1989), *on rehearing* — F.2d — (1991) (Nos. 87-6682, 88-5638, filed May 13, 1991); *California v. Acevedo,* 59 U.S.L.W. 4559 (U.S. May 30, 1991); and W. LaFave's treatise, *Search and Seizure* (2d ed. 1987) [hereinafter *Search and Seizure*]. We distinguish *Hammer* and *Acevedo infra* at nn.7 and 10, respectively. At n.10, we discuss in detail our reasons for rejecting LaFave's interpretation of *Schmerber.*

175

the words in *Schmerber* ['a clear indication'] were used to indicate the necessity for particularized suspicion that the evidence sought might be found within the body of the individual . . ..

*Montoya,* 473 U.S. at 540.

Therefore, the court of appeals incorrectly distinguished *Montoya.* Instead of following *Montoya,* the court of appeals concluded that *Winston* interpreted *Schmerber* as requiring the police to possess probable cause and a warrant, or an exception to the warrant requirement, before they may draw a blood sample from the defendant. *Seibel,* 159 Wis. 2d at 318. However, the court of appeals' reliance on *Winston* is misplaced.[7]

In *Winston,* the state, after the defendant's arrest, sought an order directing the defendant to undergo surgery to remove an object from his shoulder. The state alleged that the object was a bullet fired by the victim at the defendant in self-defense. *Winston,* 470 U.S. at 756.

The *Winston* Court began its analysis by stating:

*Schmerber* recognized that the ordinary requirements of the Fourth Amendment would be the threshold requirements for conducting this kind of surgical search and seizure. We noted [in *Schmerber*] the importance of probable cause. [*Schmerber,* 384 U.S.] at 768–769 . . ..

Beyond these standards, *Schmerber*'s inquiry considered a number of factors in determining the

---

[7]The court of appeals' reliance on *Hammer* is also misplaced. The issue in *Hammer,* 884 F.2d at 1206, was whether the police used unreasonable force in obtaining a blood sample, not the level of suspicion the police must possess before they may lawfully obtain a blood sample incident to an arrest. The court specifically noted that Hammer did not raise the issue of whether the police had reason to believe that his blood contained evidence. *Id.* at 1205 n.8. Therefore, *Hammer* does not apply to the case at bar.

'reasonableness' of the blood test. . . . Notwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect.

*Id.* at 760–61. The court of appeals seized upon *Winston*'s use of the term "probable cause" in the passage set forth above to support its conclusion that *Winston* interpreted *Schmerber* as requiring probable cause. *Seibel,* 159 Wis. 2d at 318.

However, the court of appeals overlooked three important points which fatally undermine its reliance on *Winston.* First, the portion of *Schmerber* cited by *Winston* discussed probable cause to arrest, not probable cause to search. *See Schmerber,* 384 U.S. at 768–69. *Schmerber* did not hold that probable cause was a prerequisite to drawing blood. Rather, *Schmerber* held that there must be "a clear indication" that the blood test will find evidence of a crime before the police may draw a sample of the defendant's blood incident to his arrest. *Id.* at 770. If the *Schmerber* Court had meant to require probable cause, it would have said probable cause, a commonly used term of art. The fact that the *Schmerber* Court used a different term demonstrates that it intended to require a different degree of certitude. Furthermore, prior to the *Montoya* decision, at least two courts concluded that "a clear indication" is something less than probable cause. *Rivas,* 368 F.2d at 710; *Williams,* 192 Colo. at 258, 557 P.2d at 407.

The second point overlooked by the court of appeals is that *Winston* dealt with searches which were more intrusive than the blood test in *Schmerber.* Accordingly, the *Winston* Court was primarily concerned with that part of the *Schmerber* analysis which may prohibit surgical searches and seizures regardless of the level of suspicion that the defendant's body contains evidence. As

177

the *Winston* Court stated in the first paragraph of its opinion:

> *Schmerber* cautioned [that today's holding] 'in no way indicates that [the Constitution] permits more substantial intrusions, or intrusions under other conditions.' [*Schmerber*, 384 U.S.] at 772. . . . We conclude that the procedure sought here is an example of the 'more substantial intrusion' cautioned against in *Schmerber*, and hold that to permit the procedure would violate respondent's [the defendant's] right to be secure in his person guaranteed by the Fourth Amendment.

*Winston*, 470 U.S. at 755.

The third point overlooked by the court of appeals is that the search in *Winston*, unlike the searches in *Schmerber* and the case at bar, was not conducted incident to an arrest. Therefore, the *Winston* Court did not have occasion to address what would satisfy the requirements of the fourth amendment for a blood test incident to an arrest. Ordinarily, the fact that a search of the defendant's person occurs incident to his or her arrest satisfies the threshold requirements of the fourth amendment even if the officer conducting the search lacks probable cause or an individualized suspicion that weapons or evidence are present on the person of the defendant.[8] Since the search in *Winston* did not occur

---

[8]The police may search a person incident to his or her arrest regardless of the "probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Robinson*, 414 U.S. at 235; *accord, Fry*, 131 Wis. 2d at 169. Thus, there is no requirement that an arresting officer have an individualized suspicion that weapons or destructible evidence might be present on the person of the defendant before he or she may conduct a search of same. *State v. Murdock*, 155

incident to the defendant's arrest, the fourth amendment required, at a minimum, probable cause as a prerequisite to the surgical search.

In contrast, *Schmerber* dealt with a situation in which an exception to the warrant requirement, an arrest, intervened to ameliorate the usual fourth amendment requirement of probable cause. As previously discussed, the blood sample in the case at bar was drawn incident to the defendant's arrest. Accordingly, *Schmerber*'s "clear indication" standard, not *Winston*'s probable cause standard, controls in the case at bar. Furthermore, *Winston*'s discussion of *Schmerber* is not relevant to the case at bar because *Winston* did not rely upon *Schmerber*'s "clear indication" test,[9] and the state rests its position on same in the case at bar.

Therefore, *Winston* is distinguishable from *Schmerber* and the case at bar. Furthermore, since *Winston* predates *Montoya,* any perceived conflict between the two opinions' interpretations of *Schmerber* must be resolved in favor of the *Montoya* Court's interpretation. The foregoing analysis illustrates that *Schmerber,* as interpreted by *Montoya,* provides that blood may be drawn incident to an arrest if there is a reasonable suspicion that the blood contains evidence. Therefore, we conclude that a blood sample may be drawn incident to a lawful arrest if the police reasonably suspect that the defendant's blood contains evidence of a crime.[10]

Wis. 2d 217, 237, 455 N.W.2d 618 (1990). The mere fact of the defendant's arrest justifies a search of the defendant incident to the arrest.

[9]*Montoya,* 473 U.S. at 540–41.

[10]We are not persuaded by the authorities cited by the defendant to support the decision of the court of appeals. *Acevedo,* 59 U.S.L.W. 4559, dealt with the automobile exception to the fourth

## II. WHETHER THE POLICE REASONABLY SUS-PECTED THAT THE DEFENDANT'S BLOOD CONTAINED EVIDENCE OF A CRIME

The record shows that the police possessed a reasonable suspicion that the defendant's blood contained evidence of the crime of homicide by negligent operation of a motor vehicle, to wit, evidence that the defendant had imbibed enough to lessen or impair his ability to exercise ordinary care. Such evidence would constitute

amendment. Accordingly, it does not apply to the case at bar, which involves a search incident to an arrest.

The defendant contends that LaFave's treatise supports the court of appeals' conclusion that *Schmerber* requires probable cause as a predicate to drawing blood incident to an arrest. However, LaFave actually believes that *Schmerber*'s "clear indication" test requires something more than probable cause, 2 *Search and Seizure,* sec. 5.3(c) at 497–98, 502. This conclusion is contrary to the express language of *Montoya. Montoya,* 473 U.S. at 540 *("Schmerber* [did not enunciate] a third Fourth Amendment threshold . . .").

Furthermore, LaFave's explanation of *Montoya* also ignores *Montoya*'s express language. LaFave claims that *Montoya* "seemed . . . to reject the notion that 'clear indication' was a sub-probable cause standard . . .." 1 *Search and Seizure,* sec. 3.2(a) at 561 n.23. This claim ignores *Montoya*'s use of the term "particularized suspicion" which indicates the sub-probable cause standard of reasonable suspicion. *See United States v. Cortez,* 449 U.S. 411, 417–18 (1981). LaFave's claim also ignores the fact that the *Montoya* Court repeatedly compared the seizure before it to *Terry* stops which are based on reasonable suspicion, not probable cause. *Montoya,* 473 U.S. at 542–44.

Moreover, LaFave cites no authority which interprets *Schmerber* as requiring probable cause, or more than probable cause, as a predicate for drawing a blood sample incident to an arrest. Therefore, we are not persuaded by the defendant's citation of *Search and Seizure.*

proof of criminal negligence even if it did not show that the defendant was legally intoxicated. *Billingsley v. Zickert,* 72 Wis. 2d 156, 166–68, 240 N.W.2d 375 (1976).[11]

The bases for the officer's reasonable suspicion in the case at bar are four indicia of drinking. The first indicia is the nature and cause of the accident. It is undisputed that the defendant crossed the center line just before a curve in a no-passing zone for no justifiable reason.[12] Unexplained erratic driving which causes a serious accident is an indicia of the influence of alcohol. *Martell v. Klingman,* 11 Wis. 2d 296, 308, 105 N.W.2d 446 (1960).

The second indicia of drinking is the strong odor of intoxicants that the officers at the accident scene detected emanating from the defendant's traveling com-

---

[11]We recognize that *Billingsley* is a civil case; however, criminal negligence is no different in kind from civil negligence. Rather, criminal negligence is nothing more than "ordinary negligence to a high degree . . .." Section 939.25(1), Stats. *Accord, State v. Wickstrom,* 14 Wis. 2d 416, 420–22, 111 N.W.2d 176 (1961). Therefore, *Billingsley* is relevant to the case at bar.

Furthermore, contrary to the defendant's assertions, *Billingsley* does not suggest that drinking is immaterial to the question of negligence. Rather, it holds that evidence of drinking is relevant to the issue of negligence if "the items consumed affected the driver to the extent that his ability to exercise ordinary care was impaired to an appreciable degree." *Billingsley,* 72 Wis. 2d at 167. Therefore, contrary to the defendant's assertions, the police had good reason to gather evidence of alcohol consumption even though intoxication is not an element of the crime of homicide by negligent use of a motor vehicle.

[12]While the defendant correctly points out that the record contains no evidence that he was driving erratically for a mile or two before the accident, he does not and, given the evidence in the record, cannot reasonably dispute that his erratic driving caused this accident.

panions. Ordinarily, the mere fact that the defendant's friends were drinking would not constitute evidence of the defendant's drinking. However, it is evidence of the defendant's drinking in the case at bar because the defendant and his friends were engaged in a joint venture, to wit, traveling together between taverns on their motorcycles.[13]

The third indicia of drinking is the police chief's belief that he smelled an intoxicant on the defendant. The police chief's uncertainty and inability to detect the odor again is explicable by the fact that the defendant reeked of the strong odor of an antiseptic. Contrary to the defendant's assertions, the circuit court did not find that there was no evidence of an odor of intoxicants emanating from him or that there was no evidence he had consumed alcohol. Rather, the circuit court stated that "the only odor of alcohol was the observation by Officer Peterson [the police chief] . . .." Furthermore, while the circuit court found that there was no direct evidence that the defendant had been drinking, the court also found that there was circumstantial evidence which implied that the defendant had been drinking. We are concerned by defense counsel's mischaracterization of the record on these points.

The fourth indicia of drinking in the case at bar is the defendant's conduct at the hospital. At the hospital, the defendant exhibited a belligerence and lack of contact with reality often associated with excessive drinking. When the police chief asked the defendant to pro-

---

[13]The joint venture in the case at bar distinguishes this case from *Ybarra v. Illinois,* 444 U.S. 85 (1979). Contrary to the defendant's contention, the fact that none of his companions showed signs of intoxication is irrelevant. The state relies only upon the odor of intoxication which clearly evinces the consumption of alcohol.

duce his driver's license, the defendant responded with something to the effect of "what for, they hit me."

While defense counsel correctly points out that the defendant's lack of cooperation could be attributed to the fact that the defendant did not recognize the police chief as a law enforcement officer (he was dressed in civilian clothes), that was not the reason the defendant gave for refusing to produce his driver's license. Furthermore, when the uniformed arresting officer placed the defendant under arrest, the defendant stated, "I'm under arrest, what are you doing about the car that hit me?" Contrary to the defendant's assertions, his statements indicate that he was not in contact with the undisputed reality that he had collided with the Taurus after he crossed the center line by approximately one foot.

While none of these indicia alone would give rise to a reasonable suspicion that the defendant's driving was impaired by alcohol, taken together they gave the police reason to suspect that the defendant's driving was impaired by alcohol.[14] Moreover, we must give deference to the reasonable inferences drawn by the police officers at the accident scene in light of their experience. *Terry v. Ohio,* 392 U.S. 1, 27 (1968). Therefore, the drawing of the blood sample incident to the defendant's arrest did not violate the fourth amendment.[15]

---

[14]The defendant argues that even if reasonable suspicion is the standard and said standard is satisfied by the facts in the record, we must analyze the drawing of the blood sample under the balancing-test portion of the *Schmerber* Court's analysis. We disagree. *Schmerber* already determined that the drawing of a blood sample is reasonable under facts almost identical to the facts of the case at bar. *Schmerber,* 384 U.S. at 770–72.

[15]The constitutional issue raised by Justice Bablitch's dissent was neither argued nor briefed by the parties, and his dissent

.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (dissenting). I agree with the unanimous decision of the court of appeals in this case that the police must have probable cause to believe a person's blood contains evidence of a crime before ordering blood drawn as a search incident to arrest. Accordingly, I dissent.

The United States Supreme Court squarely addressed the fourth amendment requirements for a blood test incident to arrest in *Schmerber v. California,* 384 U.S. 757 (1966). I believe that *Schmerber* established, at a minimum, a requirement of probable cause for blood tests incident to arrest and that *Schmerber* is good law.[1] The United States Supreme Court has not

is obviously the opening salvo to impose the so-called agenda of the "new federalism" on Wisconsin. With his dissent, Justice Bablitch now joins the march of those in a minority of states that reject the United States Supreme Court's interpretation of the United States Constitution. In an effort to "grant more rights" to defendants, Justice Bablitch seeks to enlarge the interpretation of the Wisconsin Constitution. Fortunately, this court does not agree that criminal defendants require or deserve additional rights over those granted by the United States Constitution and the interpretation of the Wisconsin Constitution by this court. This court has repeatedly rejected arguments which propose different state and federal standards for searches incident to an arrest due to the confusion which would result from same. *See, e.g., Murdock,* 155 Wis. 2d at 237; *Fry,* 131 Wis. 2d at 173. Furthermore, the authorities cited by Justice Bablitch are based on a flawed reading of *Schmerber, see supra* n.6, not an independent analysis of the Wisconsin Constitution.

[1]The Ninth Circuit Court of Appeals recently interpreted *Schmerber* to require "probable cause and a warrant or an excep-

subsequently addressed the issue of blood tests ordered as a search incident to arrest.

The defendant in *Schmerber* was arrested at a hospital where he was being treated for injuries sustained in an automobile accident. The police officer who arrived at the scene of the accident smelled alcohol on the defendant's breath and testified that the defendant's eyes were bloodshot, watery, and glassy in appearance. The United States Supreme Court noted that there was "plainly" probable cause to arrest the defendant and charge him with driving an automobile while under the influence of intoxicating liquor.

The Court recognized the general rule that the person of an accused may be searched incident to a lawful arrest. The Court concluded, however, that this rule has "little applicability with respect to searches involving intrusions beyond the body's surface." According to the Court:

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. *In the absence of a clear indication that in fact such evidence will be found,* these fundamental human interests require law officers to suffer the risk that such evidence may disappear

---

tion, such as exigent circumstances" as "threshold requirements for conducting a search and seizure entailing intrusion beneath the surface of the skin." *Hammer v. Gross,* 884 F.2d 1200, 1205 (9th Cir. 1989), on rehearing 1991 U.S. App. Lexis 9309 (1991). This court similarly interpreted *Schmerber* in *State v. Zielke,* 137 Wis. 2d 39, 52, 403 N.W.2d 427 (1987).

See also *State v. Bentley,* 92 Wis. 2d 860, 864, 286 N.W.2d 153 (Ct. App. 1979) (upholding blood test on the basis that there was probable cause to believe the blood contained evidence of a crime).

unless there is an immediate search. 484 U.S. at 769–70 (emphasis added).

The Court concluded that "although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol," the question remained whether the officer was required to obtain a warrant for the blood test. The Court held that exigent circumstances allowed the officer to order the blood test in *Schmerber* without a warrant.

The Court in *Schmerber* thus assumed that a warrant was required to proceed with a blood test and that a blood test may proceed without a warrant only in exigent circumstances. A warrant could not be obtained unless the state could show probable cause.

Thus I conclude that the "clear indication" language in *Schmerber* should be read to require the police to meet at least the probable cause standard before they can order a blood test as a search incident to arrest.[2]

The majority relies on *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985), for its conclusion that the police need only reasonable suspicion to order a blood test as a search incident to arrest. I agree with the court of appeals that *Montoya* does not govern the case at bar. *Montoya* applied fourth amendment requirements to the *detention* of, not a search of, a traveler at the border, a situation in which the United States Supreme Court has held that an individual's expectation of privacy is diminished, and that the balance between the interests of the government and the privacy rights of the individual is struck "much more favorably" to the government. *Id.* at 540. No bodily intrusion occurred in

[2]*See* 2 LaFave, *Search and Seizure,* sec. 5.3(c), pp. 501–502 (2d ed. 1987).

*Montoya.* The Court specifically admonished that "it is important to note what we do *not* hold. Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Id.* at 541, n. 4.

The conclusion that probable cause is needed for an invasion of the person's body makes good sense when one considers that the police must have probable cause before they may open a suitcase or a brown paper bag in an automobile.[3] Furthermore, as the Court in *Schmerber* noted, "search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required when intrusions into the human body are concerned." 384 U.S. at 770.

The circuit court found, and the state concedes, that the police in this case lacked probable cause to believe that the defendant was under the influence of an intoxicant.[4] Accordingly, I join the court of appeals in conclud-

---

[3]*See California v. Acevedo,* — U.S. —, 59 U.S.L.W. 4559 (May 30, 1991).

[4]The circuit court commented on the lack of probable cause to believe that the defendant was under the influence of an intoxicant as follows:

> There is absolutely no evidence that's credible in this record to support a finding of probable cause to believe that at the time of this accident the defendant was under the influence of an intoxicant. In fact the record is to the contrary and would support a finding that he was not under the influence of an intoxicant. There was no erratic driving, the only odor of alcohol was the observation by Officer Peterson, and his testimony under oath is I thought I could smell an odor of alcohol, but after he thought about that, he then made a concerted effort to determine if that was in fact what he had observed, and he was unable to detect any further odor even when he was trying to detect such an odor in the presence of Mr. Seibel in the x-ray room.
>
> So far as this court is concerned why there is no evidence which

ing that taking the defendant's blood in this case violated the fourth amendment. The results of the test must be suppressed.

For the reasons set forth, I dissent. I am authorized to state that Chief Justice Nathan S. Heffernan joins this dissent.

WILLIAM A. BABLITCH, J. (dissenting). The majority is in all likelihood correct in their interpretation of *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985). Their result is incorrect.

Wisconsin citizens do not have to be bound by the United States Supreme Court's increasingly narrowly drawn interpretations of the protections afforded citizens by the Fourth Amendment to the United States Constitution.

Wisconsin has its own constitution. This court can provide Wisconsin citizens, by reference to our own constitution, with greater protections than those provided by the United States Constitution as interpreted by the United States Supreme Court. I would hold that art. I, sec. 11 of the Wisconsin Constitution limits these types of bodily intrusions to the existence of probable cause, not "reasonable suspicion." *See State v. Bentley,* 92 Wis. 2d 860, 864, 286 N.W.2d 153 (Ct. App. 1979) (requiring probable cause to conclude that a blood test might furnish evidence of a crime); *see also* 74 Op. Att'y Gen. 123, 124 ("In the absence of justification under the implied consent law, actual consent or a warrant, a blood sample may nevertheless be taken if there exists probable cause for arrest and search, exigent circumstances and a reasonable method and manner of drawing the blood.")

would support a finding of probable cause that at the time of the accident the defendant, Michael Seibel, was operating or under the influence of an intoxicant.

188

*State v. Zielke,* 137 Wis. 2d 39, 52, 403 N.W.2d 427 (1987).[1]

[1]When this rather bland, if not innocuous dissent was written, which urges a standard of probable cause rather than "reasonable suspicion" before blood can be drawn, the author hardly expected a response from the majority, much less an attack that involves some rather important and basic principles of jurisprudence.

The author of the majority opinion, Justice Ceci, responded to my suggestion that we look to art. I, sec. 11 of our own Wisconsin Constitution by accusing anybody who does this of 1) wanting to "grant more rights to defendants" than does the U.S. Supreme Court; and 2) attempting to confuse law enforcement officials by establishing differing standards. In addition, Justice Ceci points with pride to a majority of our court who have consistently interpreted art. I, sec. 11 as being controlled by the U.S. Supreme Court's interpretation of the fourth amendment to the U.S. Constitution.

All of these points deserve response.

## I.

The majority accuses anybody who has the temerity to suggest that a state constitution might give greater rights to its own citizens than does the U.S. Constitution is guilty of wanting to "grant more rights" to criminal defendants than does the U.S. Supreme Court. By framing this issue in terms of "granting more rights" to criminal defendants, the majority (if it really means it) is, at worst, showing an alarming and fundamental misunderstanding of the role of a supreme court in addressing questions involving basic constitutional rights of its citizens; and, at best, mischaracterizing the role of a supreme court to a public that is in need of illumination of the role of our court in their everyday lives, not confusion.

When an issue comes to a supreme court involving a fundamental right guaranteed by either the U.S. Constitution or a state

constitution, the issue invariably arises in the context of a criminal case with a criminal defendant. Unfortunate. It should hardly need saying, but apparently it does, that the defendant is only the vehicle by which the issue arrives in the supreme court. In determining the constitutional issue, the supreme court is engaging in one of its most important and fundamental roles: it is determining what the rights are of all of its citizens with respect to the issue under consideration.

When a supreme court says that John Q. Bad-Guy's telephone cannot be tapped by the government without a warrant, the court is saying that *no* citizen's phone can be tapped without a warrant. When a supreme court says John Q. Bad-Guy's blood can be withdrawn on "reasonable suspicion," *the court is saying that everybody's blood can be withdrawn on "reasonable suspicion."*

Thus, it is not a question of "granting more rights" to criminal defendants; it is a question of determining, in Wisconsin, the rights of every one of its 4.5 million citizens under its constitution. When we speak, everyone is affected. That is fundamental. It is easily misunderstood by the public. It ought not be mischaracterized by those whose role it is to shed light, not confusion.

## II.

The majority accuses those who would look to their own state constitutions as a source of rights of "confusing" law enforcement. To say that Wisconsin law enforcement officials would be "confused" by having a standard of "probable cause" for withdrawal of blood when some other states (certainly not all) have a standard of "reasonable suspicion" is an insult to the intelligence of Wisconsin police men and women. How can it be confusing? Again, it is an accusation that brings heat but no light. Wisconsin police have operated under the standard of probable cause under many different contexts for decades, including this one. It is not this dissenter that wishes to change the standard under which our police have operated with respect to the withdrawing of blood.

Lastly, Justice Ceci points with pride to the fact that a majority of this court has "repeatedly rejected arguments which propose different state and federal standards for searches incident to an arrest . . ." It is true that our court for some time now has interpreted art. I. sec. 11 of the Wisconsin Constitution consistent with the U.S. Supreme Court's interpretation of the fourth amendment to the U.S. Constitution. But that does not mean that we should not even consider such arguments, much less attack those who urge us to do so. The manner in which Justice Ceci frames the issue ("an effort to grant more rights to criminal defendants") appears to be just such an attack. That kind of heat does little to advance a debate upon which legal scholars have widely differed.

Surely the majority has to be aware that art. I, sec. 11 was adopted in Wisconsin in 1848, some sixty plus years after the Fourth Amendment to the U.S. Constitution was adopted. Surely the framers of the Wisconsin Constitution, and the voters who approved it, did not intend art. I, sec. 11, to be a "potted plant." If they had intended it to be merely superfluous, if they had intended that we march lock-step with the U.S. Supreme Court over the centuries, as the majority in essence has apparently concluded, then why adopt it in the first place?

Art. I, sec. 11 of the Wisconsin Constitution is not and has never been intended to be a potted plant. It can serve, if this court chooses to give it life, as a bedrock of fundamental protections for all Wisconsin citizens.

And surely, the majority must recognize that this is not a radical notion at all. Even the U.S. Supreme Court has recognized, if not encouraged, the use of state constitutions for just such a purpose. It is consistent with our deeply held notions of federalism, our notions that states should be encouraged to be the laboratories of the nation.

I cannot agree with nor be silent with respect to this type of reaction of the majority that arises at even the suggestion that we look to our own constitution. It is a reaction that is visceral and instinctive, not reasoned. We may, in many if not most cases,

reject an alternative interpretation. But we should at least look.